United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDERICK SCHIFF, | Case No. C-03-04345 MMC (JCS) |
| Plaintiff(s), | |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, ET AL., | **REPORT AND RECOMMENDATION** [Case No. C-03-04345: Docket Nos. 198, 203; Case No. C-04-02261: Docket Nos. 133, 138] |
| Defendant(s). | |
| NARDA GILLESPIE, ET AL., | Related Case No. C-04-02261 MMC (JCS) |
| Plaintiff(s), | |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, ET AL., | |
| Defendant(s). | |
| MARK OSUNA, | Related Case No. C-04-02262 MMC (JCS) |
| Plaintiff(s), | |
| v. | |
| CITY AND COUNTY OF SAN FRANCISCO, ET AL., | |
| Defendant(s). | |

**I.    INTRODUCTION**

On January 12, 2006, the undersigned magistrate judge conducted a settlement conference in these three related actions (hereinafter, "the Actions," or "the *Schiff* Action," "the *Gillespie* Action"

and "the *Osuna* Action"). A settlement agreement was reached and placed on the record on the same day.[1] On the basis of the settlement agreement, the Actions were dismissed. *See Schiff* Action, Docket No. 193 (dismissing all three actions on the basis of the settlement but providing that the dismissal could be vacated if, within 120 days, any party certified to the Court that the agreed consideration had not been delivered). Soon thereafter, however, disagreements arose between the various Plaintiffs, as well as between some of the Plaintiffs and their attorney, Patrick Manshardt, regarding the distribution of the proceeds of the settlement. Concurrently, and for independent reasons, one of the Plaintiffs, Mark Sullivan, who attended the settlement conference and agreed on the record to the settlement, refused and continues to refuse to sign the written agreement. As a result, the settlement proceeds have not been released by Defendants.

Before the Court are three motions: 1) Defendants' Motion to Enforce Settlement Agreement Against Plaintiff Mark Sullivan ("Defendants' Motion to Enforce"); 2) Motion by Defendant City and County of San Francisco for Attorney's Fees & Costs Against Plaintiff Mark Sullivan, Pursuant to the Court's April 23, 2007 Notice of Reference ("Defendants' Sanction Motion"); and 3) a motion by Plaintiffs Narda Gillespie, Donald Woolard, Michael Zurcher, Dennis Quinn, Michael Hughes, Gregory Mar, and Tom Feledy ("the Gillespie Plaintiffs") entitled Application for an Order to Show Cause Compelling Mark Sullivan to Execute the Settlement Agreement or in the Alternative an Order Affirming the Settlement Agreement; and an Order for Equitable Distribution of Proceeds Pursuant to Award of Arbitrator in the Absence of an Agreement, or in the Alternative, for a Settlement Conference ("the Gillespie Motion"). The motions were referred to the undersigned magistrate judge.

---

[1] Plaintiff Narda Gillespie did not participate in the settlement conference on January 12, 2006. However, Gillespie subsequently reached an agreement with Defendants, which was put on the record before Judge Chesney on January 20, 2006. *See* Declaration of Michael J. Leon Guerrero in Support of San Francisco's Motion to Enforce Settlement Agreement Against Plaintiff Mark Sullivan (Guerrero Decl. (Motion to Enforce), Ex. B(transcript). The terms of the agreement with Gillespie were then included in the written agreement drafted to memorialize the January 12, 2006 agreement.

2

## II. BACKGROUND

### A. The Underlying Actions

The three underlying actions were brought by San Francisco police officers who challenged the procedures used by the San Francisco Police Department ("SFPD") for making promotions from the rank of sergeant to that of lieutenant. *See* Joint Case Management Conference Statement, filed September 10, 2004, in *Gillespie* Action (docket no. 19) at 2. In particular, Plaintiffs alleged that Defendants improperly denied them promotions on the basis of race and/or ethnicity. *Id.* at 4. All of the Plaintiffs challenged the promotions made pursuant to lieutenant's examinations administered in 1999. In addition, Plaintiff Frederick Schiff challenged Defendants' failure to promote him based on a lieutenant's examination administered in 1993. Although all of the Plaintiffs were sergeants when the actions were initiated, three of the Plaintiffs – Kurt Bruneman, Donna Leonard[2], and Mark Osuna – were promoted on June 12, 2004, to the rank of lieutenant. *Id.*

### B. The Settlement Agreement

On January 12, 2006, following a settlement conference over which the undersigned magistrate judge presided, the parties (except Gillespie) entered into a settlement agreement, which was placed on the record.[3] The Court explained the procedure and legal significance of placing the agreement on the record as follows:

> What we're going to do is I'm going to recite what I understand to be the terms of the settlement into the record. I'm going to then ask each lawyer whether I've done so accurately. I'm going to then ask each of the settling plaintiffs, and the settling – and the defendants, by their representatives, whether they understand and agree to the settlement. Once I've done that, and everyone's agreed to the settlement, you have a final and binding deal here today, subject only to one condition subsequent, and that is the approval of the agreement by the San Francisco Police Commission and by the San Francisco Board of Supervisors. It is customary that there be a written memorialization of this settlement. It's a hugely important thing. It's important for

---

[2] The Gillespie Motion refers to a Donna Meixner, who is not named as a plaintiff in any of the actions. A Donna Leonard is named as a plaintiff in the *Gillespie* Action, however. The Court presumes that Donna Meixner and Donna Leonard are the same person.

[3] Although plaintiff Gregory Mar was not present at the settlement conference, his attorney, Patrick Manshardt, represented that he had authority to speak for Mar. Manshardt consented to the terms of the settlement agreement on the record on Mar's behalf. Mar later disputed Manshardt's authority to consent to the settlement on his behalf, but he subsequently signed the written agreement.

3

> plaintiffs, it's important for the defendants, it's important because it makes very clear, in a very tight way, things that are slightly less clear on the record. So I encourage you all to do that and to sign the final deal, but nothing is contingent on that signature. You have a binding deal here today, subject only to the approval of the board.

Guerrero Decl. (Motion to Enforce), Ex. A (transcript) at 4.

The Court proceeded to set forth the terms of the settlement agreement as follows:

> This is a settlement between all defendants and all plaintiffs, with the exception of plaintiff Narda Gillespie.
>
> The defendants will pay to the settling plaintiffs and their attorneys a total of $1.5 million. This settlement amount includes all plaintiffs' attorneys' fees, expert fees and other costs to date, including attorney time spent or to be spent working on the settlement, and specifically including all the attorney time dealing with Ms. Gillespie's case. However, the settlement does not include attorneys' fees going forward in representing only Ms. Gillespie.
>
> Second, the City will credit plaintiff Mark Sullivan with 125.5 compensation time hours.
>
> Third, $14,742 of plaintiff Sullivan's portion of the global settlement, that is to say, of this settlement, will be considered and treated as back wages for the working days during the dates January 1, 2005 through December 31, 2005, inclusive. This amount represents the difference between sergeant's compensation and lieutenant's compensation for one year prior to the date settlement is reached. Deductions for applicable taxes and withholding will be made from this amount. This $14,742 will be included as compensation for the calendar year 2005-2006 for purposes of calculating retirement benefits.
>
> Next, the settling plaintiffs generally release all of the defendants from all claims, whether known or unknown, relating to their employment, including but not limited to the claims actually raised in the Complaint in this matter, arising out of any events occurring up through the date of the settlement, that is to say, the date the settlement is approved by the Board of Supervisors in this case, and waives the provisions of California Civil Code Section 1542.
>
> The settling Plaintiffs acknowledge that they are relinquishing all claims for promotion, seniority or back pay through the date the settlement is approved by the Board of Supervisors.
>
> Settling plaintiffs further acknowledge and recognize that this agreement is a "no fault" settlement in light of the disputed claims, and nothing contained in the settlement agreement constitutes an admission of liability or wrongdoing by any individual defendants or the City, which liability or wrongdoing is expressly denied by all parties.

4

> The settling plaintiffs agree not to provide assistance, directly or indirectly, to any other plaintiffs in pending lawsuits or administrative proceedings against the City based on the same or similar set of facts, except as required by law.
>
> Finally, as part of the settlement, this case will be dismissed in its entirety with respect to the settling plaintiffs and the defendants, and each party to bear their own attorneys' fees and costs except to the extent it's included in the $1.5 million.
>
> Finally, the settlement is contingent upon approval by the San Francisco Police Commission and the San Francisco Board of Supervisors.

*Id*. at 4-7.

Subsequently, Plaintiff Narda Gillespie reached a settlement with Defendants, and that agreement was placed on the record before Judge Chesney on January 20, 2006. Guerrero Decl. (Motion to Enforce), Ex. B. Under that agreement, Gillespie was to receive a $100,000.00 payment, which included fees and costs, in return for the relinquishment of all claims for promotion, seniority or back pay through the date of the settlement's approval. *Id*. at 5-8.

After all parties had agreed to a settlement, a written settlement agreement was drafted that included the terms of the agreements that were placed on the record as to all parties (including Gillespie). Guerrero Decl. (Motion to Enforce), Ex. C (written settlement agreement). The written agreement provides for a payment for attorneys' fees and damages in the amount of $1.6 million, to be paid in a lump sum to Plaintiffs' attorney, Patrick Manshardt. The written agreement also provided that 125.5 compensation time hours would be credited to Mark Sullivan and that $14,742.00 of the settlement amount would be considered back wages for Mark Sullivan for the period January 1, 2005, through December 31, 2005. *Id*. at 3. All of the plaintiffs except Mark Sullivan have now signed the written agreement.

### C. Mark Sullivan's Refusal to Sign the Written Agreement

Although Mark Sullivan was present at the January 12, 2006 settlement conference and agreed on the record to the terms of the settlement, he has since refused to sign the written agreement. He does not assert that the written agreement is in any way inconsistent with the agreement that was placed on the record. Rather, he explains his refusal to sign as follows:

> 3. During settlement talks, I negotiated for a number of compensation time hours considerably higher than the 125.5 in the settlement agreement, I agreed to the 125.5 hours plus the $14,720.00 solely because it was represented to me by the Deputy City Attorney from the Office of the City Attorney, City and County of San Francisco, that the maximum amount of compensation time that any employee of the San Francisco Police Department could accrue was 480. I agreed to the 125.5 hours solely in reliance on the representation made to [me] relative to the maximum amount that could be accrued.
>
> 4. Subsequent to January 12, 2006, I learned that the representation relative to the maximum that could be accrued was erroneous. Attached hereto, marked Exhibit A, and included herein by reference is a four-page document containing the names of 206 employees of the San Francisco Police Department who have accrued compensation time hours in excess of 480. Please note that one employee has accrued 2,548.5 hours.
>
> . . . .
>
> 6. Subsequent to January 12, 2006, I have offered to sign a settlement agreement in this matter so the settlement could be concluded but only on the condition that the Deputy City Attorney renegotiate both the amount of compensation time hours and back wages. To date, the Deputy City Attorney has absolutely refused to even consider further negotiations. It is this refusal by the Deputy City Attorney that has led to my refusal to sign the settlement agreement.

Affidavit of Mark Sullivan in Opposition to Application for Order to Show Cause Compelling Sullivan to Sign Settlement Agreement ("Sullivan Decl.") at 2.

During the course of briefing on the instant motions, Defendants have provided a declaration that addresses the SFPD's current policy regarding accrual of overtime compensation hours. In particular, the Deputy Chief of Administration for the SFPD explains as follows:

> In 2003, to address the problem of comp-time ("CTO") balances in excess of 480 hours, the City and San Francisco's Police Officer's Association ("POA") negotiated an MOU provision providing that a non-exempt employee with more than 480 hours of CTO as of July 1, 2003 may not accrue additional CTO unless and until his or her balance falls below 480 hours. . . . The Department is enforcing this MOU provision and non-exempt employees with CTO balances 480 hours or more are not accruing additional CTO. Currently, there is no mechanism in place to require non-exempt employees with CTO balances over 480 hours to use their CTO. Rather, commanding officers are working with those employees to develop plans to reduce their balances. As part of their efforts to reduce CTO balances, several employees have asked the Department to pay off CTO hours over the 480 hour limit.

6

Declaration of Charles Keohane in Support of Defendants' Motion for Attorney's Fees ("Keohane Decl.") at 2.

The MOU provision referenced in the Keohane Declaration provides as follows:

> B. <u>Compensatory Time-Off</u>
>
> 1. Employees who are required or suffered to work overtime shall receive paid overtime. However, employees may request to earn compensatory time-off at the rate of time-and-one-half in lieu of paid overtime, subject to the approval of the Chief of Police or designee and except as provided below:
>
>    a. Employees may not accrue more than 480 hours of compensatory time off.
>
>    b. Employees with more than 480 hours of compensatory time-off as of July 1, 2003 may not accrue additional compensatory time-off until and unless their compensatory time-off balances fall below 480.
>
> . . . .

Keohane Decl., Attachment (Excerpt of Memorandum of Understanding between City and POA).

### D. Post-Settlement Dispute About Distribution and Neutral Evaluation

In the meantime, concerns were being expressed by some of the Plaintiffs (the Gillespie Plaintiffs) about the distribution of the proceeds of the settlement. *See* Affidavit in Support of Application for an Order to Show Cause Compelling Mark Sullivan to execute the Settlement Agreement or in the Alternative an Order Affirming the Settlement Agreement; and an Order for Equitable Distribution of Proceeds Pursuant to Award of Arbitrator in the Absence of an Agreement, or in the Alternative, for a Settlement Conference ("Murphy Decl.") at 2-3. These Plaintiffs retained attorney Gerald Murphy to represent them with respect to these concerns. *Id*. According to Murphy, the concerns arose because the Gillespie Plaintiffs had an "understanding [when they entered into the settlement agreement] that . . . all similarly situated Plaintiffs would be treated equally," but they "discovered after the settlement was put on the record that Mr. Manshardt was treating certain clients preferentially." *Id*. at 3.

Regarding the distribution of settlement proceeds, the following facts appear to be undisputed. First, at the settlement conference, Manshardt told each of the Gillespie Plaintiffs that

he or she would receive $100,000.00 of the settlement payment. *See* Murphy Decl., Ex. I (Arbitration Statement) at 2. Second, when the payment is disbursed, Manshardt intends to allocate $100,000.00 to each of the Gillespie Plaintiffs, $200,000.00 to Plaintiff Mark Schiff, $50,000.00 to each of the three individuals who were promoted to lieutenant after the actions were filed (Osuna, Leonard, and Bruneman), and $450,000.00 to himself for fees and costs. Opposition to Application for Order Affirming Equitable Distribution of Settlement Proceeds Pursuant to Award of Arbitrator or for Settlement Conference ("Schiff Plaintiffs' Opposition") at 5-7. Third, there is no written agreement regarding allocation of settlement proceeds between the Plaintiffs.

It is not clear whether or not the Gillespie Plaintiffs were told at the settlement conference that Schiff would be receiving $200,000.00. Manshardt's Declaration is ambiguous as to what he told each Plaintiff. He states, "the amounts each Plaintiff would receive was fully disclosed to them before they agreed to the settlement agreement." Declaration of Patrick Manshardt, attached to Schiff Plaintiffs' Opposition, at 9. Thus, it is unclear whether he told each Plaintiff only the amount he or she was to receive, or if he told each one of the Plaintiffs the amounts that *every* Plaintiff would receive.

Conversely, the Gillespie Motion and the supporting declaration by Murphy are silent as to whether the Gillespie Plaintiffs knew how much Schiff was to be paid. In the attached Arbitration Statement, signed by Murphy, it is stated that at the settlement conference, each of the Plaintiffs was "separated from the group and asked if he or she would accept $100,000 to settle with the City." Murphy Decl., Ex. I at 2-3. The Arbitration Statement continues:

> When asked directly what the others were receiving Manshardt failed to disclose the other distributions, and indeed encouraged each of them not to inquire of each other so as "not to jeopardize the negotiations with the City." Each was led to believe that he or she was receiving the same as the other Sergeants – $100,00.00.

*Id* at 3. Murphy's description of events in the Arbitration Statement is not, however, supported by any declarations on the part of the Gillespie Plaintiffs regarding what they were told at the settlement conference.

In any event, the two groups of Plaintiffs eventually agreed to participate in a "non-binding neutral evaluation of the dispute." Murphy Decl. at 4; *see also* Manshardt Decl. at 9-10. The

8

neutral evaluation occurred on November 29, 2006. Murphy Declaration, Ex. K (Neutral Evaluation) at 1. In his written decision, the Neutral Evaluator concluded that it would be fair to make a "modest reallocation of the settlement amounts and a reallocation of the attorneys' fees reimbursement." *Id*. at 2. In particular, the Neutral Evaluator concluded that the following allocation would be fair: $150,000.00 to Schiff; $115,000.00 to the sergeants (i.e., the Gillespie Plaintiffs and Sullivan); $45,000.00 to the lieutenants (i.e., Bruneman, Leonard, and Osuna) and the remaining $395,000.00 to Manshardt for fees and costs. *Id*. at 3. The Neutral Evaluator justified the reduction in Mansardt's fees under the new scheme on the basis that the dispute had resulted, in part, from Manshardt's "decision to keep information away from his joint clients rather than fully disclose all information to all clients" as required under California law. *Id*. at 2.

Manshardt has rejected the recommendation of the Neutral Evaluator. Manshardt Decl. at 10.

### E.     The Motions

#### 1.     The Motion to Enforce and Defendants' Sanction Motion

Defendants ask the Court to enforce the settlement agreement against Mark Sullivan on the basis that he has already agreed to the terms of the settlement on the record. The City asserts that under such circumstances, the Court may enforce the agreement under its inherent power, citing *Doi v. Halekulani Corp.*, 276 F.3d 1131 (9th Cir. 2002) and *TNT Marketing, Inc. v. Agresti*, 796 F.2d 276 (9th Cir. 1986). Defendants further seek an order compelling Sullivan to pay, as a sanction for his refusal to sign the agreement, Defendants' fees and costs incurred in connection with the Motion to Enforce. According to Defendants, they have incurred $1,850.00 in fees and costs. *See* Guerrero Decl. (Motion to Enforce) at 4.

Sullivan asserts in his declaration that he agreed to the settlement in reliance on Defendants' representations regarding overtime compensation hours. Although he does not cite any legal authority in support of his position, he implies that he should be permitted to avoid the agreement because he later discovered that Defendants' representation regarding its overtime compensation time policy was (allegedly) inaccurate.

None of the remaining Plaintiffs object to Defendants' request for enforcement as to Sullivan and indeed, the Gillespie Plaintiffs make a similar request in their motion, as discussed below.

9

### 2. The Gillespie Motion

In their motion, the Gillespie Plaintiffs seek an order: 1) compelling Sullivan to execute the written agreement; 2) requiring that distribution of the settlement proceeds be made according to the recommendation contained in the Neutral Evaluation; and 3) requiring Manshardt to pay to the Gillespie Plaintiffs $21,299.58 in attorneys' fees and costs – the amount the Gillespie Plaintiffs allegedly incurred "as a result of Manshardt's refusal to agree to equitably distribute the settlement proceeds." In the title of the Gillespie Motion, there also appears to be a request for a settlement conference if the Court declines to award the requested relief. The Gillespie Plaintiffs cite no legal authority in support of any of the requests in their motion.

Sullivan opposes the request for enforcement against him and filed a declaration offering his reasons for refusing to sign the written agreement, which is described above. The remaining Plaintiffs do not object to the request for enforcement against Sullivan, but *do* object to the request that the recommendation of the Neutral Evaluator be confirmed with respect to distribution of the settlement proceeds. They point to the fact that the parties agreed the neutral evaluation would be non-binding. They also argue that this Court does not have subject matter jurisdiction to enforce the Neutral Evaluator's recommendation regarding the distribution of proceeds, citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994).

In their Reply, the Gillespie Plaintiffs assert that the Court has subject matter jurisdiction over its requests, citing the Court's inherent power to enforce settlement agreements (citing the same cases cited by Defendants, *Doi* and *TNT*) and its power to regulate the conduct of lawyers appearing before it (citing *Paul E. Iacono Structural Engineer, Inc. v. Humphrey*, 722 F.2d 435, 439 (9th Cir. 1983)).

### III. ANALYSIS

#### A. Enforcement of the Settlement Agreement Against Mark Sullivan

In determining whether the Court may order enforcement of the settlement agreement, the Court must first address whether it has the authority to enforce the agreement. If it does, the Court must determine whether it should invoke that authority. Finally, if enforcement of the agreement is appropriate, the Court must address the form that its exercise of authority should take.

### 1. Jurisdiction to Enforce the Settlement Agreement

The case law indicates that courts generally do not have subject matter jurisdiction relating to enforcement of settlement agreements negotiated outside of court where the actions have been dismissed and the order of dismissal does not reference the settlement agreement as the basis for dismissal. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 US 375, 380 (1990). On the other hand, where an action has not yet been dismissed, or where the settlement agreement is referenced in the dismissal order as the basis for the dismissal, courts *do* have inherent authority to enforce the settlement agreement. *See Doi*, 276 F.3d at 1139; *TNT*, 796 F.2d at 278. In *Kokkonen*, the Supreme Court explained this distinction as follows:

> Generally speaking, we have asserted ancillary jurisdiction (in the very broad sense in which that term is sometimes used) for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent, . . . ; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees, . . . Neither of these heads supports the present assertion of jurisdiction. As to the first, the facts underlying respondent's dismissed claim for breach of agency agreement and those underlying its claim for breach of settlement agreement have nothing to do with each other; it would neither be necessary nor even particularly efficient that they be adjudicated together. No case of ours asserts, nor do we think the concept of limited federal jurisdiction permits us to assert, ancillary jurisdiction over any agreement that has as part of its consideration the dismissal of a case before a federal court.
>
> But it is the second head of ancillary jurisdiction, relating to the court's power to protect its proceedings and vindicate its authority, that both courts in the present case appear to have relied upon, judging from their references to "inherent power," . . . . We think, however, that the power asked for here is quite remote from what courts require in order to perform their functions. We have recognized inherent authority to appoint counsel to investigate and prosecute violation of a court's order. . . . But the only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement. The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal-either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist. That, however, was not the case here. The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order.

11

1 *Id.* at 380-381.

2 In *Doi*, the parties had negotiated a settlement that was placed on the record before the district court. 276 F.3d at 1134. The parties agreed that within the week they would sign a written agreement memorializing the settlement, as well as a stipulation dismissing the action, which was to be filed with the Court. *Id.* at 1135. The plaintiff, Doi, subsequently declined to sign the agreement or stipulation, however, seeking instead to renegotiate the terms of the settlement. *Id.* The district court granted the defendant's motion to enforce the settlement agreement and awarded monetary sanctions against Doi. *Id.* at 1136. The Ninth Circuit affirmed the decision, holding that the district court had not abused its discretion in enforcing the settlement agreement because the terms and existence of the agreement were on the record and thus clear, and because the written agreement accurately reflected the terms of the agreement on the record. *Id.* at 1139. The court further held that the district court had not abused its discretion in awarding fees and costs as a sanction for Doi's unreasonable refusal to sign the settlement documents. *Id.* at 1141.

Here, as in *Doi*, the terms and existence of the agreement are in the record and therefore clear. Further, in contrast to the facts in *Kokkonen*, the settlement was expressly referenced in the Court's order of dismissal as the basis for the dismissals. *See Schiff* Action, Docket No. 193. In addition, the order of dismissal makes clear that if the settlement were to fall through, the Court would vacate the dismissal and reinstate to the calendar the motions that were pending at the time of the dismissal. Under such circumstances, the holding in *Kokkonen* does not apply. *See* 511 US at 378 ("It must be emphasized that what respondent seeks in this case is enforcement of the settlement agreement, and not merely reopening of the dismissed suit by reason of breach of the agreement that was the basis for the dismissal"). Therefore, the Court concludes that it has the authority to enforce the settlement agreement in this action. It is recommended, however, that the Court expressly vacate the dismissals, pursuant to its own order, and restore the cases to its calendar.[4] Once the actions are restored, there is no doubt that the Court has jurisdiction to enforce the settlement.

---

[4] To the extent the dismissal order set a 120-day deadline for vacating the dismissal, the Court finds no authority suggesting that the Court does not have the discretion to extend that deadline where, as here, the process of finalizing the settlement was hampered by unforeseen difficulties.

12

### 2. Whether the Court Should Exercise its Inherent Authority

Having determined that it has the authority to enforce the settlement agreement, the Court next addresses whether it should exercise that authority under the facts here or alternatively, whether there is some defect relating to the settlement agreement that make its enforcement improper. Settlement agreements are contracts and, therefore, are governed by the general principals of contract law. *See Adams v. Johns-Manville*, 876 F.2d 702, 704 (9th Cir. 1989). Thus, where there is a "fundamental defect in the agreement itself," the agreement may be subject to rescission. *See A.J. Indus. v. Ver Halen*, 75 Cal. App. 3d 751, 759 (1978) (holding that "[a] party to a settlement agreement may not seek to rescind it by proving the merits of its original claim and then establishing that an erroneous assessment by him of that claim led to the settlement"). For example, the settlement agreement may be unenforceable if it is procured by fraud, or if consent was given on the basis of a significant and material mistake. *See Merced County Mut. Fire Ins. Co. v. The State of California*, 233 Cal. App. 3d 765, 771 (1991). In this case, the Court finds no "fundamental defect" in the settlement agreement and therefore concludes that it should be enforced.

To the extent that Sullivan may be seeking to invoke a defense to enforcement on the basis that he was induced to consent to the terms of the settlement agreement by fraud, that defense fails. Under California law, the following requirements must be met to establish fraud:

> A fraudulent misrepresentation is one made with the knowledge that it is or may be untrue, and with the intention that the person to whom it is made act in reliance thereon. . . . It must appear, however, not only that the plaintiff acted in reliance on the misrepresentation but that he was justified in his reliance. . . . He may not justifiably rely upon mere statements of opinion, including legal conclusions drawn from a true state of facts . . ., unless the person expressing the opinion purports to have expert knowledge concerning the matter or occupies a position of confidence and trust. . . . If, however, the opinion or legal conclusion misrepresents the facts upon which it is based or implies the existence of facts which are nonexistent, it constitutes an actionable misrepresentation.

*Wilke v. Coinway, Inc.*, 257 Cal. App. 2d 126, 136 (1967) (quoting *Cortez v. Weymouth*, 235 Cal. App. 2d 140, 151 (1965). Where a party is represented by counsel and/or where the alleged misrepresentation was made by an adversary during the course of negotiations, courts have often held that reliance is unjustifiable. *See Scognamill v. Credit Suisse First Boston LLC*, 2005 WL

13

2045807 (N.D. Cal. 2005) (holding as a matter of law that reliance on representation of adversary in execution of merger agreement was unjustifiable where parties were represented by counsel during negotiation process); *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324, 1332 (1986) (holding that fraud claim failed because plaintiff was represented by counsel at the time of the allegedly fraudulent statement and it was not "reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation").

Here, Sullivan has not established even that there was a misrepresentation: the representation that "the maximum time hours that any employee of the San Francisco Police Department could accrue was 480 [hours]," *see* Sullivan Decl. at 2, is consistent with the MOU provision provided by Defendants regarding overtime compensation hours. Under that policy, there has been a cap on the accrual of overtime compensation hours since 2003. The fact that some employees continue to carry balances that exceed that cap, cited by Sullivan in support of his position, is consistent with this policy, which permits employees who, prior to 2003, accrued overtime compensation hours in excess of 480 hours, to retain those hours while at the same time working with supervisors to reduce their balances. Given that Defendants did not misrepresent their policy, they also have not been shown to have made an untrue statement with knowledge that it was untrue and intended to induce reliance. Further, because Sullivan was represented by counsel when the agreement was negotiated, and in light of the adversarial relationship between Sullivan and Defendants, Sullivan's reliance on the representation by Defendants was unjustifiable. In short, the facts do not establish that Sullivan was fraudulently induced to enter into the settlement agreement.

Nor can Sullivan avoid enforcement of the settlement agreement on the basis of a mistake of fact. Under California law, "[w]hen contracting parties have entered into a contract under a material mistake of law or fact, the parties are entitled to be relieved by reason of their mutual mistake." *Merced County Mut. Fire Ins. Co.*, 233 Cal. App. 3d at 771. This rule applies to a unilateral mistake "when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party." *Id*. (citation omitted). As discussed above, the evidence shows that there was no mistake of fact. Further, there is no evidence that Defendants "fostered" or "encouraged" Sullivan

14

in any mistake of fact. Therefore, Sullivan cannot avoid enforcement of the settlement agreement on this basis.

It is recommended that the Court exercise its inherent authority to enforce the settlement agreement.

### 3. Form of Enforcement

The parties have requested that the Court compel Sullivan to sign the written agreement. The Court concludes that this is an appropriate form of relief. While the court in *Doi* did not expressly state that enforcement of the settlement agreement could be achieved by compelling the objecting party to sign, at least one court in this district has found that such relief may be awarded under *Doi*. *See Armstrong v. City and County of San Francisco*, 2004 WL 2713068 (N.D. Cal. 2004) (recommending that district court judge compel party to oral settlement agreement that was placed on the record to sign written agreement that accurately reflected terms of the oral agreement), adopted by Chief Judge Walker in Order filed October 1, 2004; *see also Lee v. Hunt*, 631 F.2d, 1171, 1181 (compelling a party to execute a written settlement agreement where written agreement reasonably embodied the terms of the oral agreement that had been placed on the record).

It is undisputed – and the Court finds – that the written agreement at issue here accurately reflects the terms that were negotiated by the parties and placed on the record. Although Defendants are willing to seek the approvals in the settlement based on an order of enforcement and the transcript of the settlement agreement, the Deputy City Attorney indicated at argument that the signed written agreement was reasonably necessary in order to obtain those approvals, and that he was unsure whether approval could be obtained without written agreement. Accordingly, subject to the approvals identified in the settlement, the settlement should be enforced, and Sullivan should be ordered to execute the written settlement agreement.

### B. Distribution of the Settlement Proceeds

The Gillespie Plaintiffs request that, in addition to enforcing the settlement agreement as to Sullivan, the Court order distribution of the proceeds consistent with the recommendation of the Neutral Evaluator. Such an order would be improper.

The distribution of the settlement proceeds among the Plaintiffs in these actions was not addressed in the settlement agreement that was put on the record in this Court. As a result, the question of distribution of the settlement proceeds is outside the purview of the Court's inherent power. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 US 375, 380 (1990). Specifically, the Court concludes that under the reasoning of *Kokkonen,* where the distribution of settlement proceeds was not addressed in any way in the settlement agreement that was cited as the basis for dismissal, disputes relating to distribution of settlement proceeds are too remote from the "what courts require in order to perform their functions" to justify reliance on the court's inherent power to resolve them. As a result, in the absence of any other source of federal jurisdiction, the Court does not have subject matter jurisdiction to adjudicate this dispute.[5]

The Court rejects the reliance of the Gillespie Plaintiffs on *Paul E. Iacono Structural Engineer, Inc. v. Humphrey*, 772 F.2d 435, 438 (9th Cir. 1983) in support of the existence of subject matter jurisdiction. In that case, the court of appeals affirmed the district court's order disqualifying a law firm representing a party in an action before it on the basis that the district court has "the primary responsibility for controlling the conduct of attorneys' practice before it." It is implicit in *Iacono* that this rule applies only to conduct that has direct bearing on the case and does not give the district court authority to regulate attorney conduct outside of the action. Otherwise, the concerns expressed in *Kokkonen* relating to the limits of the court's inherent powers would come into play. As stated above, the distribution of settlement proceeds was not addressed in the settlement agreement that gave rise to dismissal of the actions and therefore, this Court's inherent authority does not extend to disputes relating to the distribution of settlement proceeds.[6]

---

[5] Because it is undisputed that Plaintiffs did not agree to binding arbitration, the Federal Arbitration Act, 9 U.S.C. § 2, does not give rise to subject matter jurisdiction in this case.

[6] Of course, the question of whether counsel breached a duty to Plaintiffs, what the agreement with each Plaintiff may have been as to the portion of the settlement proceeds he or she would receive, and whether the amounts should be adjusted, are all questions of state law that may be addressed in state court.

16

### C. Requests for Sanctions

Both Defendants and the Gillespie Plaintiffs have requested an award of attorneys' fees and costs as a sanction. In particular, Defendants seek $1,850.00 in fees and costs from Sullivan, while the Gillespie Plaintiffs seek $21,299.58 in fees and costs from Manshardt personally. It is recommended that both requests be denied.

With respect to the request by the Gillespie Plaintiffs, to the extent that this Court does not have subject matter jurisdiction to adjudicate issues relating to distribution of settlement proceeds under the circumstances of this case, it also does not have subject matter jurisdiction to award fees relating to the adjudication of disputes on this question. Even if it did, the circumstance here would not justify an award of sanctions.

As to Defendants' request, the Court does have discretion to award fees against Sullivan on the basis that he unreasonably failed to sign the written agreement. *See Doi*, 276 F.3d at 1141. The Court nonetheless concludes that Sullivan's conduct was not so improper as to warrant the imposition of sanctions.

## IV. CONCLUSION

For the reasons stated above its is recommended that Defendants' Motion to Enforce be GRANTED; that Defendants' Motion for Sanctions be DENIED; and that the Gillespie Motion be GRANTED with respect to the request for an order enforcing the settlement agreement and DENIED in all other respects. It is recommended that the dismissals in the three actions be vacated and that the cases be restored to the district judge's calendar. It is further recommended that Plaintiff Mark Sullivan be compelled to execute the written agreement. Once the settlement is approved by the appropriate agencies, the cases should be dismissed with prejudice.

Finally, the undersigned magistrate judge offers to conduct a settlement conference to assist Plaintiffs in resolving their disputes regarding distribution of settlement proceeds should Plaintiffs desire to participate in one.

Dated: July 12, 2007

_____
JOSEPH C. SPERO
United States Magistrate Judge